UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                                       :
MYRA L. BREVARD,                                                       :
                                                                       :
                            Plaintiff,                                 :
                                                                       :
                    -v-                                                :
                                                                       :
CREDIT SUISSE,                                                         :
                                                                       :
                            Defendant.                                 :
                                                                       :
-----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__1/3/2024__

23-cv-428 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant Credit Suisse ("Defendant") moves, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, and Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to compel arbitration and dismiss this action. Dkt. No. 10. For the following reasons, the motion is granted.

## BACKGROUND

The Court assumes the truth of the following facts, which are undisputed for purposes of this motion.

Myra Brevard ("Plaintiff") is a "woman with a disability," namely "severe pain due to nerve damage." Dkt. No. 1 at ECF p. 8. She first began to work for Defendant in 2004 as an administrative assistant, but left two years later to pursue other opportunities. *Id.*

In 2014, Defendant rehired Plaintiff as an administrative assistant in Defendant's New York City office. *Id.* As a result of her disability, Plaintiff began to experience extreme pain in her right foot in October 2015. *Id.* When her pain grew too severe in May 2016, Defendant permitted Plaintiff to go on disability leave. *Id.* A month later, Plaintiff underwent surgery to alleviate her foot pain, but complications from the surgery led her to develop an infection that

required her to remain home and receive intravenous antibiotics for six weeks.  *Id.*  Plaintiff

underwent another surgery in February 2018 to remedy those complications, but it was similarly

unsuccessful.  *Id.* at ECF p. 9.  The second surgery damaged the nerves in Plaintiff's right leg—

reducing her mobility, leaving her with chronic pain, and requiring her to take several

medications.  *Id.*  Because of her debilitating pain, Plaintiff was unable to return to work.  *Id.*

      Although Plaintiff had been on disability leave since May 2016, she hoped to resume

working on a part-time basis in January 2020.  *Id.*  The following month, after consulting her

doctor, she emailed her manager about that possibility.  *Id.*  Her manager never responded;

instead, Karen Chung, who said she worked in Defendant's Human Resources Department,

reached out to Plaintiff about her inquiry.  *Id.* at ECF p. 10.  Plaintiff explained that she wanted

to return to work, but that she needed a reduced work schedule to accommodate her disability.

*Id.*  When Chung did not "respond immediately," Plaintiff called Defendant's Benefits

Department to ask if she could speak to a different "Human Resource Generalist."  *Id.*  An

individual in the Benefits Department stated that Defendant did not employ Human Resource

Generalists and that Plaintiff would need to consult a Disability Administrator.  *Id.*  Concerned

that Chung was not a Human Resources Generalist, Plaintiff asked what Karen Chung's title

was.  *Id.*  The individual from the Benefits Department said Chung was a Recruiter.  *Id.*

      In March or April of 2020, Chung advised Plaintiff that her disability leave term would

expire in May 2020, at which time her employment would be terminated if she did not return to

work.  *Id.* at ECF p. 11.  Chung stated that Plaintiff's disability leave was subject to that time

limit based on a policy that applied to all employees hired after 2007.  *Id.*  Plaintiff objected.  *Id.*

Because she was originally hired in 2004, she asserted that she was exempt from the 2007 policy.

*Id.* Chung stopped responding to Plaintiff's emails. *Id.* And, in April 2020, a Disability Administrator notified Plaintiff that her employment was terminated effective May 2020. *Id.*

## PROCEDURAL HISTORY

Plaintiff filed a charge of disability-based discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), which issued a right-to-sue notice. *Id.* at ECF pp. 25, 32–33. Plaintiff commenced this action on January 18, 2023 by filing a *pro se* Complaint against Defendant, alleging violations of the Americans with Disabilities Act of 1990 ("ADA") and Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). *Id.* at ECF pp. 1, 4. On January 25, 2023, the Court directed the Clerk of Court to issue a summons as to Defendant and required Plaintiff to serve Defendant within 90 days of the issuance of that summons. Dkt. No. 3. The following day, the Clerk of Court issued the summons, Dkt. No. 5, and the Court referred the case to mediation, Dkt. No. 4. Both the summons and mediation referral order were mailed to Plaintiff that day. Dkt. No. 6.

On April 7, 2023, shortly after Plaintiff effected service, Defendant appeared. Dkt. Nos. 7–8. Defendant then filed the motion to compel arbitration and dismiss the suit and an accompanying memorandum of law on April 18, 2023. Dkt. Nos. 10, 13. Defendant also filed a declaration, Dkt. No. 12, that included the following signed agreements between Plaintiff and Defendant as exhibits: an employment agreement, dated October 7, 2014, Dkt. No. 12-2; an agreement to use Defendant's Employment Dispute Resolution Program (the "Program"), dated October 27, 2014, Dkt. No. 12-3; an employment agreement, dated October 11, 2004, Dkt. No. 12-6; an agreement to use the Program, also dated October 11, 2004, Dkt. No. 12-7; and a third employment agreement, dated April 14, 2015, Dkt. No. 12-8.

The Court ordered Plaintiff to respond to Defendant's motion and advised her that she could seek assistance from the New York Legal Aid Group Legal Clinic for Pro Se Litigants. Dkt. No. 16.

Following a court-granted extension, Plaintiff filed a response in opposition to the motion to compel arbitration and dismiss.  Dkt. No. 19.  Plaintiff's response noted that it "was prepared with assistance from the New York Legal Assistance Group's Legal Clinic for Pro Se Litigants in the SDNY." *Id.* at 1 n.1.  In her response, Plaintiff averred that she had been "ready, willing, and able" to participate in the Program, but that Chung had sent her an email in April 2020 (the "Chung Email") stating that Plaintiff could not participate in the Program because it was only for existing employees. *Id.* at 2.  Plaintiff attached a copy of the Chung Email to her response. *Id.* at ECF pp. 5–6.  Plaintiff also asserted that she had relied on the Chung Email in filing suit, as Defendant had failed to invoke the Program until April 2023. *Id.* at 3.  Plaintiff therefore argued that Defendant should be equitably estopped from compelling arbitration. *Id.* at 3–4.  Finally, Plaintiff stated that "to the best of her knowledge and memories" she did "not recall" signing the October 27, 2014 agreement to use the Program. *Id.* at 3 n.2.

Defendant filed a reply on August 18, 2023, in which Defendant disputed the authenticity of the Chung Email and argued that, even if the Court were to accept it at face value, equitable estoppel would not apply.  Dkt. No. 25 at 1.  Additionally, Defendant filed two declarations casting doubt on the Chung Email's veracity.  Dkt. Nos. 23–24.  In the first, Chung explained that she was an Assistant Vice President in Defendant's Human Resources Department during the relevant period.  Dkt. No. 23 at 1.  She stated that she had no recollection of ever sending the Chung Email and that the Email contained grammatical and spelling errors that were "uncharacteristic" and "not errors [she] would often make when corresponding with a Bank

4

employee." *Id.* at 1–2.  In the second, Defendant's Global Head of Collaboration Engineering stated that Defendant maintains internal emails for a period of ten years pursuant to banking and securities regulations.  Dkt. No. 24 at 2.  He attested that Defendant performed "exhaustive searches" for the Chung Email on its system, but that it was "not located through any of [those] search efforts." *Id.* at 4.

After the Court scheduled an evidentiary hearing to resolve the parties' factual dispute regarding the Chung Email, Dkt. No. 28, Defendant filed a letter motion for an order requiring Plaintiff to produce an electronic copy of the Chung Email or to submit her email account or electronic devices to forensic examination, Dkt. No. 31.  Plaintiff retorted that the Chung Email was authentic, but that she did not have an electronic copy of the Email and was unwilling to allow Defendant to search through her personal email account or devices, as they contained medical information and privileged communications.  Dkt. No. 35 at 2.  Accordingly, in the interest of "mov[ing] forward" with her lawsuit, Plaintiff "requested that [the Chung Email] be withdrawn from this case" and that she be permitted to file "an amended opposition to the Motion to Dismiss without the email[]." *Id.*  Although Defendant opposed Plaintiff's request to file an amended opposition, Dkt. No. 38, the Court permitted Plaintiff to withdraw her prior opposition and to file an amended response to Defendant's motion to compel arbitration and dismiss the case, Dkt. Nos. 38, 40.

Plaintiff filed an amended opposition on October 13, 2023, in which she neither relied on the Chung Email nor argued that Defendant should be equitably estopped from compelling arbitration.  Dkt. No. 41.  Instead, she contested the validity of the October 27, 2014 agreement to use the Program and the April 14, 2015 employment agreement. *Id.* at 1–2.  She contended that UBS had recently acquired Defendant and they would "become one bank," such that UBS

cannot assert Defendant's right to compel arbitration.  *Id.* at 2–3.  And she suggested that

Defendant had waived its right to arbitrate by failing to invoke that right in a timely manner.  *Id.*

at 2.  Defendant submitted an amended reply on October 20, 2023, contesting each of Plaintiff's

arguments.  Dkt. No. 42.

## LEGAL STANDARD

The "FAA compels judicial enforcement of . . . written arbitration agreements."  *Cir. City*

*Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001).  Under the FAA, a "written provision in any . . .

contract . . . evidencing a transaction involving commerce to settle by arbitration a controversy

thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon

such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

"Section 2 embodies [a] national policy favoring arbitration."  *Buckeye Check Cashing, Inc. v.*

*Cardegna*, 546 U.S. 440, 443 (2006); *see also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S.

576, 581 (2008) ("Congress enacted the FAA to replace judicial indisposition to arbitration.").

Arbitration agreements stand "on equal footing with other contracts," so courts must

"enforce them according to their terms."  *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. 63, 67

(2010); *see also Ross v. Am. Exp. Co.*, 547 F.3d 137, 143 (2d Cir. 2008) ("[T]he purpose of

Congress in enacting the FAA 'was to make arbitration agreements as enforceable as other

contracts, *but not more so.*'" (emphasis in original) (quoting *JLM Indus., Inc. v. Stolt-Nielsen SA*,

387 F.3d 163, 171 (2d Cir. 2004) *abrogated on other grounds as recognized by Loc. Union 97,*

*Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 67 F.4th 107 (2d Cir. 2023))).

However, "a party may be compelled to arbitrate a dispute only to the extent he or she has agreed

to do so," *Moton v. Maplebear Inc.*, 2016 WL 616343, at *3 (S.D.N.Y. Feb. 9, 2016) (quoting

*Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 569 (S.D.N.Y. 2009)), and

"generally applicable contract defenses, such as fraud, duress, or unconscionability, may be

applied to invalidate arbitration agreements," *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

Section 4 of the FAA provides that "[a]ny party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may seek "an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). As a result, "[t]he Court's role on a motion to compel arbitration is 'narrow.'" *Lonstein L. Off., P.C. v. Evanston Ins. Co.*, 2022 WL 72302, at *8 (S.D.N.Y. Jan. 6, 2022) (quoting *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 139 (3d Cir. 1998)).

> [F]irst, [the Court] must "determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration."

*Bristol v. Securitas Sec. Servs. USA, Inc.*, 597 F. Supp. 3d 574, 578 (S.D.N.Y. 2022) (quoting *JLM Indus.*, 387 F.3d at 169).

"Courts deciding motions to compel apply a 'standard similar to that applicable for a motion for summary judgment.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). "Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.* (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special*

*Opportunities Master Fund*, 661 F.3d 164, 172 (2d Cir. 2011)).  By contrast, "[i]f there is an

issue of fact as to the making of the agreement for arbitration, then a trial is necessary."

*Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).

        Finally, the Court is mindful that Plaintiff is proceeding *pro se* and so the Court "must

take care to construe [her] papers liberally, in deference to her *pro se* status."  *Clinton v.*

*Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011).  The Court therefore

interprets Plaintiff's submissions "to raise the strongest arguments that they suggest."  *Triestman*

*v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (quoting *Pabon v.*

*Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).

## DISCUSSION

### I.      Whether the Parties Agreed to Arbitrate

        At the outset, the Court must "ascertain whether the parties entered into an agreement to

arbitrate."  *Credit Suisse AG v. Graham*, 533 F. Supp. 3d 122, 128 (S.D.N.Y. 2021) (quoting

*Monisoff v. Am. Eagle Invs., Inc.*, 927 F. Supp. 137, 137–38 (S.D.N.Y. 1996)).  Defendant

contends that Plaintiff "confirmed her understanding and acceptance of [the Program's]

mandatory arbitration provision, in writing, no less than *five times*."  Dkt. No. 13 at 4 (emphasis

in original).  In support of that assertion, Defendant provides signed copies of five agreements

between the parties: agreements to use the Program from 2004 and 2014, and employment

agreements from 2004, 2014, and 2015.  Dkt. Nos. 12-2–12-3, 12-6–12-12-8.  Plaintiff states that

she does not recall signing the 2014 agreement to use the Program and argues that agreement and

the 2015 employment agreement are invalid.  Dkt. No. 41 at 1–2.  She also contends that UBS's

acquisition of Defendant precludes the enforcement of any agreement to use the Program.

To form a contract under New York law,[1] "there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (quoting *Louros v. Cyr*, 175 F. Supp. 2d 497, 512 n.5 (S.D.N.Y. 2001)); *see also Filho v. OTG Mgmt., LLC*, 2022 WL 4567498, at *2 (S.D.N.Y. Sept. 29, 2022). "New York contract law presumes that a written agreement is valid and that it accurately reflects the intention of the parties, and imposes a heavy burden on the party seeking to disprove those presumptions." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 241 (S.D.N.Y. 2020) (quoting *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 831 (S.D.N.Y. 1996)). And absent "fraud or other wrongful act on the part of another contract party, a party 'who signs or accepts a written contract . . . is conclusively presumed to know its contents and to assent to them.'" *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (alteration in original) (quoting *Metzger v. Aetna Ins. Co.*, 125 N.E. 814, 816 (N.Y. 1920)).

The parties' 2014 agreement to use the Program, Dkt. No. 12-3, is a valid contract under New York law. Defendant made Plaintiff an offer by providing her with the agreement in writing a few weeks after she rejoined Defendant in October of 2014. *See Chen-Oster*, 449 F. Supp. 3d at 241. She accepted that offer by signing the agreement and continuing to work for Defendant. *See Fenton v. Criterion Worldwide*, 2020 WL 1489795, at *5 (S.D.N.Y. Mar. 27, 2020); *Pelligrino v. Morgan Stanley Smith Barney LLC*, 2018 WL 2452768, at *4 (S.D.N.Y. May 31, 2018). Her continued term of employment constituted valuable consideration, *see*

---

[1] Defendant argues, and Plaintiff does not contest, that New York law applies to the relevant agreements between the parties. Dkt. No. 13 at 8; *see Am. Gen. Life Ins. Co. v. Platinum Elite Grp., Inc.*, 2014 WL 1276482, at *3 n.1 (E.D.N.Y. Mar. 27, 2014). In any event, those agreements govern Plaintiff's employment in Defendant's New York City office, so "New York has the most significant contacts with the matter in dispute." *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 47 (E.D.N.Y. 2017).

*Tuskey v. Volt Info. Scis., Inc.*, 2001 WL 873204, at *4 n.2 (S.D.N.Y. Aug. 3, 2001), and Plaintiff

is presumed to have understood and assented to the terms of the agreement because she signed it,

*see Oganesyan v. Tiffany & Co.*, 2023 WL 7928098, at *4 (S.D.N.Y. Nov. 16, 2023).

Plaintiff challenges that straightforward reasoning on two grounds.  First, she states that

she does not "recall signing this document on October 27th 2014."  Dkt. No. 41 at 1.  But she

does not dispute that her signature is genuine.  A party's mere "failure to recall signing [an]

arbitration agreement does not absolve him from his contractual obligations."  *Daniels v.

Aaron's, Inc.*, 2020 WL 5810018, at *5 (W.D.N.Y. Sept. 30, 2020); *see also Victorio v. Sammy's

Fishbox Realty Co., LLC*, 2015 WL 2152703, at *11 (S.D.N.Y. May 6, 2015).  Thus, "whether or

not she remembers doing so, Plaintiff is nonetheless bound by the arbitration agreement[] that

she signed."  *Padro v. Citibank, N.A.*, 2015 WL 1802132, at *5 (E.D.N.Y. Apr. 20, 2015).

Second, Plaintiff avers that she had already worked for Defendant for twenty days when

she entered into the agreement to use the Program so "the contract is not valid by their own

contract rules," Dkt. No. 41 at 2, as the agreement states: "I understand that my employment by

Credit Suisse is expressly conditioned on my entering into this agreement," Dkt. No. 12-3.

Liberally construed, Plaintiff's argument is that her employment could not serve as consideration

for the agreement to use the Program because she was already Defendant's employee when she

entered into that agreement.  *See Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 517 (1st Dep't 2021)

("[P]ast consideration is no consideration and cannot support an agreement because the detriment

did not induce the promise." (quoting *Korff v. Corbett*, 65 N.Y.S.3d 498, 502 (1st Dep't 2017)));

*Pennolino v. Central Prods. LLC*, 2023 WL 3383034, at *15 (S.D.N.Y. May 11, 2023) (same).

While *past* employment is inadequate consideration to establish a contract, however, *continued*

or *future* employment is sufficient to do so.  *See Lockette v. Morgan Stanley*, 2018 WL 4778920,

at *5 (S.D.N.Y. Oct. 3, 2018) ("[C]ontinued employment generally serves as legal consideration sufficient to enforce an arbitration agreement."); *Stern v. Espeed, Inc.*, 2006 WL 2741635, at *2 (S.D.N.Y. Sept. 22, 2006) ("[T]he continuation of employment alone is sufficient consideration."). Consequently, the parties' 2014 agreement to use the Program was supported by valuable consideration.[2]

In addition to her challenges to the 2014 agreement to use the Program, Plaintiff suggests that the 2015 employment agreement is invalid due to the circumstances in which Plaintiff entered it. According to Plaintiff, though the document "appears to be a hiring contract," it was in fact "a document for a lateral position in a different department which had to take place because I was being stalked and harassed by a Managing Director in the Equity Research Department." Dkt. No. 41 at 2. Defendant's managers and Human Resources Department allegedly failed to discipline the Managing Director or prevent the stalking and harassment. *Id.* After Plaintiff "threaten[ed] to reach out to EEOC," Defendant transferred Plaintiff. *Id.* Plaintiff signed the 2015 employment agreement, as she "felt [her] job would be threatened if [she] did not go through the [Program]." *Id.* The Court construes Plaintiff's argument as an assertion that the 2015 employment agreement is invalid because she entered into it under duress.[3] Under the

---

[2] To the extent Plaintiff avers that "my employment by Credit Suisse" means "my *past* employment by Credit Suisse," as opposed to "my *continued* employment by Credit Suisse," she misconstrues the agreement. Because the former interpretation would render the contract unenforceable due to a lack of consideration, the Court must adopt the latter interpretation. *See McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th 674, 697 (2d Cir. 2023) ("[C]ontracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable." (quoting *Walsh v. Schlecht*, 429 U.S. 401, 408 (1977))).

[3] Alternatively, if Plaintiff's argument is that Defendant's prior inaction shows that arbitration pursuant to the Program would be biased in Defendant's favor, her objection is premature. *See Aviall, Inc. v. Ryder Sys., Inc.*, 110 F.3d 892, 895 (2d Cir. 1997) ("[I]t is well established that a district court cannot entertain an attack upon the qualifications or partiality of arbitrators until after the conclusion of the arbitration and the rendition of an award." (quoting *Michaels v.*

FAA, a party cannot be compelled to arbitrate based on an agreement that was the product of duress. *See Rent-A-Center West, Inc.*, 561 U.S. at 68; *Ragone*, 595 F.3d at 121. But Plaintiff's duress argument does not concern the relevant agreement. Even if the 2015 employment agreement were invalid, Plaintiff had already acceded to arbitration in the 2014 agreement to use the Program. Because the ultimate inquiry is "whether the parties have entered into *a* valid agreement to arbitrate," *APG Worldwide Ltd. v. Passfeed Inc.*, 2022 WL 17991625, at *1 (S.D.N.Y. Dec. 29, 2022) (quoting *Ameriprise Fin. Servs., Inc. v. Beland*, 672 F.3d 113, 128 (2d Cir. 2011)) (emphasis added), Plaintiff's objection to the 2015 employment agreement is insufficient to avoid arbitration.

Finally, Plaintiff argues that Defendant can no longer exercise its rights under any of the parties' arbitration agreements, since UBS acquired Defendant in 2022. Dkt. No. 41 at 2–3. She alleges that the two banks are currently integrating into "one bank, in this case UBS," and that once that integration occurs "UBS should not be allowed to make Human Resource decision[s] regarding me as an employee." *Id.* But, even on her own account, the banks have not yet integrated into a single entity. *See id.* at 2 ("The two banks are now going through an integration process. At the completion of the integration which is expected in 2024–2025 when [sic] Credit Suisse will no longer even use its name."). Any legal implications of the banks' integration into a single entity will therefore arise only at a future date. Moreover, Plaintiff's description of UBS's acquisition of Defendant indicates that when the integration process is complete, UBS will fully stand in the shoes of Defendant—*i.e.*, UBS will be Defendant's successor-in-interest. And "[t]he law is clear that an arbitration agreement may be enforced both by and against the

---

*Mariforum Shipping, S.A.*, 624 F.2d 411, 414 n. 4 (2d Cir. 1980))); *see also Flores v. Nat'l Football League*, 2023 WL 4744191, at *7 (S.D.N.Y. July 25, 2023).

successors-in-interest of the original signatories." *Porzig v. Dresdner Kleinwort Benson N. Am. LLC*, 1999 WL 518833, at *5 n.5 (S.D.N.Y. July 21, 1999); *see Nathan v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2007 WL 3102186, at *1 (D. Conn. Oct. 19, 2007); *Donel Corp. v. Kosher Overseers Ass'n of Am., Inc.*, 2001 WL 228364, at *3 (S.D.N.Y. Mar. 8, 2001).  UBS's acquisition of Defendant therefore does not invalidate the parties' 2014 agreement to arbitrate pursuant to the Program.

## II.       Scope of the Agreement to Arbitrate

Next, the Court must determine whether the claims in Plaintiff's Complaint—namely, disability-based discrimination under the ADA and violations of HIPAA—fall within the scope of the 2014 agreement to use the Program.[4]  *See Bristol*, 597 F. Supp. 3d at 578.  Defendant contends that those claims "fall squarely within [its] scope."  Dkt. No. 13 at 9.  By contrast, Plaintiff does not address this issue.  *See* Dkt. No. 41.

The 2014 agreement to use the Program provides:

> I agree that I will submit all claims I may from time to time have against Credit Suisse (including each of its past, present, and future legal entities, and its and their past, present, and future directors, officers, and employees, in both their personal and their institutional capacities) ("Credit Suisse") that relate to or arise from my employment or termination (including manner of termination) of employment . . . . I understand that the types of claims I am hereby agreeing to submit to the Program include, without limitation, all employment-related claims under . . . the Americans with Disabilities Act of 1990.

Dkt. No. 12-3.  As this provision "is not limited disputes that 'arise' from" Plaintiff's employment or termination "but also [covers] those that 'relate' to it," the agreement "constitutes 'the paradigm of a broad' arbitration agreement."  *Lonstein L. Off.*, 2022 WL 72302, at *9

---

[4] "Because neither party argues that the arbitrator should decide this question, there is no need to apply the rule requiring 'clear and unmistakable' evidence of an agreement to arbitrate arbitrability."  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 n.5 (2010) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

(quoting *Convergen Energy LLC v. Brooks*, 2020 WL 5549039, at *16 (S.D.N.Y. Sept. 16, 2020)).  "[T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage."  *FritzCo LLC v. Verizon Commc'ns Inc.*, 2022 WL 4592900, at *2 (S.D.N.Y. Sept. 30, 2022) (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)).

Plaintiff's claims are subject to the parties' broad agreement to arbitrate.  In her Complaint, Plaintiff alleges that Defendant violated the ADA by "provid[ing her] with terms and conditions of employment different from those of similar employees" and "terminat[ing her] employment."  Dkt. No. 1 at ECF p. 5.  The 2014 agreement to use the Program explicitly covers claims under the ADA and extends to disputes that relate to Plaintiff's employment and termination alike.  Consequently, Plaintiff's ADA claim falls within the ambit of the parties' arbitration agreement.  Her HIPAA claim also arose from Plaintiff's employment, as Plaintiff contends that her communications with Chung in seeking to return to work in 2020 made Chung "privy to private medical information . . . in direct violation of [Plaintiff's] HIPPA [sic] rights."  *Id.* at ECF p. 10.  Thus, her HIPAA claim against Defendant arising from her employment is likewise subject to the parties' broad arbitration agreement.

## III.    Arbitrability of Plaintiff's Federal Claims

The third inquiry is "whether Congress intended [the] federal statutory claims asserted to be nonarbitrable."  *Gilbert v. Dell Techs., Inc.*, 415 F. Supp. 3d 389, 400 (S.D.N.Y. 2019).  Defendant argues—and Plaintiff does not dispute—that Congress did not intend to preclude arbitration of the Complaint's ADA and HIPAA claims.  Dkt. No. 13 at 11.  The Court agrees.  Plaintiff bears the burden of demonstrating "that Congress intended [her] federal statutory claim[s] to be nonarbitrable,"  *Googla Home Decor LLC v. Uzkiy*, 2009 WL 2922845, at *4 n.1

(E.D.N.Y. Sept. 8, 2009), yet she has made no effort to meet that burden.  Moreover, "courts in this Circuit have repeatedly held that Congress did not intend . . . ADA claims be nonarbitrable." *LeDeatte v. Horizon Media*, 571 F. Supp. 3d 72, 76 (S.D.N.Y. 2021); *see also Borden v. Wavecrest Mgt. Team Ltd.*, 572 F. App'x 10, 11 (2d Cir. 2014) (summary order); *Wilmore v. Charter Commc'ns LLC*, 2023 WL 2503306, at *7 (D. Conn. Mar. 14, 2023).  As for Plaintiff's HIPAA claim, the Second Circuit has held that "HIPAA confers no private cause of action, express or implied."  *Meadows v. United Servs., Inc.*, 963 F.3d 240, 244 (2d Cir. 2020) (per curiam).  Because individuals "cannot enforce HIPAA provisions by filing lawsuits in federal court," *Moussa v. Sullivan*, 2022 WL 2906177, at *3 (E.D.N.Y. July 22, 2022), it follows *a fortiori* that Congress did not intend parties to litigate, rather than arbitrate, HIPAA claims.  Thus, Plaintiff has not shown that either of her federal statutory claims are nonarbitrable.

In sum, the parties entered into a valid, binding arbitration agreement in 2014 that covers the claims in Plaintiff's Complaint, all of which are arbitrable.  The Court therefore concludes that "the disputes in this action are subject to arbitration."  *Nulife Ent., Inc. v. Torres*, 698 F. Supp. 2d 409, 414 (S.D.N.Y. 2010); *see also Molina v. Kaleo, Inc.*, 363 F. Supp. 3d 344, 352 (S.D.N.Y. 2019) ("[T]he arbitration provision is valid and the parties shall proceed under its terms.").

## IV.    Waiver

Plaintiff raises a final argument against compelling arbitration: even if her claims are subject to a valid arbitration agreement, Defendant waived its right to arbitration under the agreement by failing to invoke that right in a timely manner.  Dkt. No. 41 at 2.  Specifically, she observes that Defendant first informed Plaintiff that she must submit her claims to the Program after she filed a complaint with the EEOC, the EEOC issued a right to sue, Plaintiff filed suit in this Court, and her case had been pending for three months.  *Id.*  Defendant replies that it would

have been futile to request arbitration before the EEOC and that Defendant "promptly invoked its right to arbitrate at the earliest stage of this federal action."  Dkt. No. 42 at 3.

To decide whether Defendant waived its right to arbitrate, the Court "ask[s] whether [Defendant's] conduct evinced a knowing relinquishment of its arbitration rights."  *Billie v. Coverall N. Am. Inc.*, 2023 WL 2531396, at *3 (2d Cir. Mar. 15, 2023) (summary order).  "The plaintiff bears the burden of showing waiver."  *In re Generali COVID-19 Travel Ins. Litig.*, 577 F. Supp. 3d 284, 293 (S.D.N.Y. 2021).  For decades, the Second Circuit assessed whether a party had waived its right to arbitrate by considering "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice."  *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 229 (2d Cir. 2001)). Unlike in ordinary cases of concerning the waiver of contractual rights, prejudice was the *sine qua non* for waiver of the right to arbitrate.  *Id.* ("Waiver of the right to compel arbitration due to participation in litigation may be found only when prejudice to the other party is demonstrated." (quoting *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002))).  But the Supreme Court recently rejected that prejudice requirement as an improper, "arbitration-specific procedural rule" in *Morgan v. Sundance, Inc.*, 596 U.S. 411, 414 (2022).  Since *Morgan*, courts in this Circuit have disagreed as to the proper framework for analyzing whether a party

has waived her right to arbitrate.[5]  *See Alvarez v. Experian Info. Sols., Inc.*, 2023 WL 2519249, at *9 (E.D.N.Y. Mar. 15, 2023) ("The district courts within the Circuit that have thus far addressed waiver post-*Morgan* have taken varying approaches.").  However, the Second Circuit has continued to treat the amount of time elapsed and amount of litigation as highly probative indicia of waiver.  *See Nicosia v. Amazon.com, Inc.*, 2023 WL 309545, at *4 n.2 (2d Cir. Jan. 19, 2023) (summary order); *see also Alvarez*, 2023 WL 2519249, at *9.  In the wake of *Morgan*, these factors are relevant because they identify "affirmative conduct or . . . a failure to act" that can manifest a clear "intent to relinquish a contractual protection."  *Deng*, 640 F. Supp. 3d at 264 (quoting *Herrera*, 2022 WL 2819072, at *8).

Defendant did not waive its right to arbitrate here.  Plaintiff's lawsuit had been pending for three months when Defendant filed the instant motion to compel arbitration.  *See* Dkt. Nos. 1, 10.  And most of that relatively brief period was attributable to Plaintiff's delay in effectuating service, *see* Dkt. No. 42 at 3, such that it does not suggest that Defendant intended to relinquish its contractual right to resolve disputes through the Program.  Nor has Defendant extensively litigated this case.  To the contrary, the motion to compel was Defendant's first substantive filing, and the parties have not yet commenced discovery.  Thus, Defendant's position

---

[5] Based on the Supreme Court's admonition that "courts are not to create arbitration-specific procedural rules," *Morgan*, 596 U.S. at 419, some have concluded that courts should exclusively apply general contract-law principles to assess waiver, *see Deng v. Frequency Elecs., Inc.*, 640 F. Supp. 3d 255, 263 (E.D.N.Y. 2022); *cf. Herrera v. Manna 2nd Ave. LLC*, 2022 WL 2819072, at *8 (S.D.N.Y. July 18, 2022) (explaining that this approach "seems most consistent with *Morgan*'s reasoning").  Others have interpreted *Morgan* more narrowly, as eliminating the prejudice requirement from the Second Circuit's arbitration-specific test but leaving that test's remaining factors intact.  *See De Jesus v. Gregorys Coffee Mgmt., LLC*, 2022 WL 3097883, at *7 (E.D.N.Y. Aug. 4, 2022); *see also Bayron-Paz v. Wells Fargo Bank, N.A.*, 2023 WL 4399041, at *4 (S.D.N.Y. July 7, 2023).

throughout this lawsuit has been plain and unequivocal: it has steadfastly insisted on its contractual right to arbitrate Plaintiff's claims.

But Plaintiff suggests that the Court should infer waiver from Defendant's failure to raise its right to arbitrate before the EEOC.  Dkt. No. 41 at 2.  The Supreme Court has held that the EEOC is not bound by private arbitration agreements.  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  As a result, any effort to compel arbitration before the EEOC is straightforwardly unavailing.  *See O'Meara v. IntePros Inc.*, 2017 WL 3140359, at *6 (D. Conn. July 24, 2017).  A party's decision to eschew "a futile attempt to compel arbitration" before the EEOC therefore does not evince an intentional relinquishment of the right to arbitrate.  *Brown v. Coca-Cola Enters., Inc.*, 2009 WL 1146441, at *12 (E.D.N.Y. Apr. 28, 2009) (Bianco, J.); *see O'Meara*, 2017 WL 3140359, at *6; *Santos v. GE Cap.*, 397 F. Supp. 2d 350, 356 (D. Conn. 2005).

## V.     Whether to Stay the Case

The sole remaining question is whether the Court should stay the proceedings pending arbitration or dismiss this case.  Section 3 of the FAA provides that, when referring a dispute to arbitration, a court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  Based on the "text, structure, and underlying policy of the FAA," the Second Circuit has held that § 3 "mandate[s] a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."  *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015).  But "none of the parties request[s] a stay" here.  *Lawrence v. Sol G. Atlas Realty Co.*, 841 F.3d 81, 83 n.1 (2d Cir. 2016).  Accordingly, the Court will dismiss the action.  *See Kutluca v. PQ N.Y. Inc.*, 266 F. Supp. 3d 691, 705 (S.D.N.Y. 2017).

**CONCLUSION**

Defendant's motion to compel arbitration and dismiss is GRANTED.  The Clerk of Court is respectfully directed to close Dkt. No. 10 and close the case.


SO ORDERED.

Dated: January 3, 2024
     New York, New York

_____
LEWIS J. LIMAN
United States District Judge

19